We'll turn to the fourth case of the day, United States v. Hopper, number 18-2576, also from the Blum Clinic, Ms. Roszkowski. Good morning, your honors. My name is Emily Roszkowski, and I, along with my colleague Anne Hudson, represent the appellant Rex Hopper. We are also practicing pursuant to Illinois Supreme Court Rule 711 under the supervision of Sarah Shrupp with the Blum Clinic at Northwestern Law. Mr. Hopper's conviction was flawed at nearly every stage of the proceedings against him. He was denied access to the cooperating witness's proffer letters, the government failed to prove the conspiracy that it alleged, and he received an excessively high sentence due to an improper enhancement and clear double counting. Now, I'd like to start there. At a minimum, this court should remand for resentencing because of the double counting in this case. When you look at the evidence presented at trial and at sentencing, it's clear that the drugs that have been assigned to Mr. Hopper via Lucas Holland and Randall Riley are the same drugs. This is a plain error affecting Mr. Hopper's substantial rights for which he's serving an extra 47 months in prison. Do you agree you didn't raise this below? It was not raised below, but that does not mean that it was waived. Do you agree that it was not objected to below, specifically when the pre-sentence investigation report was provided, which detailed the drug quantity from the probation officer's perspective, and there was no objection when the court asked? There was no objection from either party. This is simply an error that everyone missed. It's quite similar to the case out of the First Circuit Romero, which we cite in our brief, in which the probation officer missed it, the district court missed it, both parties missed it here. It's a plain error, and at most it was forfeited. And if you take a look at the Supreme Court's case in Rosales-Morales, you'll see that that's still a plain error affecting the substantial rights of Mr. Hopper. Now, another obvious error here is the Rule 16 violation. Rule 16 states that the government must permit the defendants to inspect documents within the government's control that are material to preparing the defense. Proffer letters are always material to preparing the defense. This court said in United States v. Baker that something is material if it is exculpatory or helpful for impeachment. Would you also agree that the Rule 16 argument was not raised below? I know the Giglio was, but not Rule 16. So, Your Honor, we don't quite agree with that. You'll see in the transcript at page 4 that trial counsel noted that he had requested the proffer letters. At page 14, he noted that he gets them in discovery on a routine basis, so he did reference discovery. And then on page 5, he clearly preserves this issue for appeal, saying, I would like the record to be clear, but I think I ought to be provided with a copy of these documents. And from those statements, the district court should have guessed that you were relying or he was relying on Rule 16? The district court failed to recognize Rule 16 as another opportunity for disclosure of these documents. Whose obligation was that to raise that in the first instance? Well, again, as I said, this was raised. Although the words Rule 16 were not explicitly stated by trial counsel, based on the references to discovery and the clear preservation for appeal, it does seem that that could have been an inference that was made, that he was referencing discovery. What would have been available to defense counsel in the proffer letters that was not available to defense counsel in the agreements? The plea agreements? Yes, Your Honor. So first of all, we don't know what was in these proffer letters. So even though the government maintains that defense counsel knew what was in them, that's not correct. Defense counsel said that typically he understands that they're a form letter, but we haven't seen them in this case. He did have other proffer letters from this case, correct? He had Mr. Hopper's proffer letter, which was not signed, and also Blake Gordon's proffer letter was disclosed to him as well, but that's not part of the record on appeal. And didn't the government represent below that their proffer letters are always the same? They did not, Your Honor. That it's a form proffer letter? That is not what the government represented, Your Honor. Trial counsel stated, in my experience, these letters do not change, only the names of the defendants do, but the government made no representation of that fact, and that's an important distinguishing factor from Weidenferner, in which a witness confirmed that his missing proffer letter was identical to a proffer letter that was produced. Now, even if we don't get into hypotheticals about what kind of nefarious terms could be in the proffer letters that we haven't seen, there are still some differences. All of the proffer letters are dated, and they're all signed. This helps the trial counsel explore other avenues for discovery. Explore other avenues for discovery. Because they're dated, it helps him build a timeline. He can call the AUSA and determine what might have been discussed in that proffer discussion, so it opens up other avenues that way, and they could also be used as additional impeachment methods at trial. I see I'm running out of time, so I'm going to move on to the conspiracy. How would they be used as additional impeachment, not available through the plea agreements? So one example of that in the record, Your Honor, is the testimony of Lucas Holland, who testified that he did not mention Hopper at his post-arrest statement, but he did mention him at his proffer statement. So if there was a term in the proffer letter requiring him to discuss Rex Hopper's drug distribution activities, that certainly would have been impeaching material. But again, even without these hypotheticals, if we look at merely the dates, those could have been used to impeach Ranel Condutis and Billy Craig. I suppose a proffer letter might indicate a little bit, by way of emphasis, that the witness was telling the prosecutor what he knew the prosecutor needed to hear to get the agreement. Absolutely, Your Honor. That would certainly be impeaching if there was a term to that effect. And if that involved your client, it would be particularly helpful. Absolutely, Your Honor. That's correct. Now turning to conspiracy, the critical issue here is whether we had a conspiracy or a buyer-seller relationship. We know that the jury was confused about this because of the note that they sent explicitly stating, we are confused as to the definition of conspiracy, referencing the buyer-seller instruction and referencing the conspiracy instruction. There are some clear figures in this alleged conspiracy who can be knocked out as buyer-sellers, such as Lucas Holland and Randall Riley. The record is clear that Mr. Hopper and Robert Weir merely bought drugs from them for a period of about a month. They would give the money to Holland and Riley. Holland and Riley would go get the drugs. But isn't it clear as well that there are some actors here who clearly are acting in concert in order to purchase drugs? Yes, Your Honor. And if this court does choose to uphold some subset of this conspiracy, we would still urge you to remand for a resentence. Perhaps if you were to uphold based on Damien Williams, there is, if you look in the PSR, he's only responsible for 283.5 grams of drugs, which is well below the 1.96 kilograms of drug amount attributed to Mr. Hopper.  In the past, yes, you have. There's a case, Kin Cannon, in which this court found, they affirmed the conspiracy, and they found that he should have been resentenced because of, they found he didn't conspire with the person named in the indictment, but they upheld it based on a conspiracy with someone else. They did remand for resentence, or they said it was harmless error in the sentence because the sentence would have been the same. But clearly in this case, the drug amount is substantially less than it was in Kin Cannon. But he would have been responsible for relevant conduct? Well, relevant conduct, Your Honor, again, we would support the method of calculation in the PSR, which only looks to the drugs that Mr. Hopper purchased from these individuals. And in terms of relevant conduct, if it was just a conspiracy between Mr. Hopper and Damien Williams, then there would be no evidence to tie the rest of the drugs, the rest of the 1.96 kilograms, to that smaller subset. And briefly, I'd just like to touch on the enhancement. Why wouldn't that be relevant conduct as to Mr. Hopper, though, whether it's part of the conspiracy or not? Well, Your Honor, in terms of relevant conduct, what has to be proven is that in the case of this jointly undertaking criminal activity, this is in the guidelines at 1B1.3, you have to show that it was within the scope of the jointly undertaken activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with that activity. That's a fact-based inquiry that there haven't been any findings about in the lower court at this point. And so it wouldn't be appropriate to assign that as relevant conduct here. And very briefly, the enhancement. As we describe in our brief, the law has really just gotten beyond what Congress intended here. But if this court does not take this opportunity to re-examine its precedent, then we can still distinguish, based on this issue of abandonment, it's arguable that Mr. Hopper did not even use his home for the purposes of distributing drugs for over half of this time period in the conspiracy. So that could be one. Well, the witness said that the drugs, that it tapered off mid-air, right? Yes, and she was very unclear about the timeline there. She said, this is in the sentencing hearing at 33, Aaron Wright says the last 6, 8 months, a year, he would do things away from the house. So at least we're taking off 6 months at the back end. We can also take off 9 months at the front end of the alleged conspiracy because Aaron Wright did not meet Mr. Hopper until September 30, 2015. But she also had testified that he stored the meth there almost every day that they lived there together. She said there was some sort of activity going on there every day, which again is not quite clear in terms of what she's meaning based on that. So there's not quite enough evidence for this enhancement, and I'd like to reserve the rest of my time if that's all right. Thank you. All right. Thank you very much, Ms. Rusnowski. For the government, Mr. Norwood. Good morning, Your Honors, and may it please the court. I will go in the same order as my opponent did, starting with relevant conduct. The government's position is that the relevant conduct argument is waived, and it is not simply that the defense counsel did not object to the relevant conduct. The government's position is that the defense counsel affirmatively stated that the relevant conduct was correct on three separate occasions, well, three times in two separate documents, in his first initial objection to the relevant conduct, or excuse me, to the PSR. Are you talking about relevant conduct or drug quantity? Well, what the defense counsel said is the base offense level is correct, and the base offense level is nothing but relevant conduct. And the first time was in the record, it's document 82, in his initial objection to the pre-sentence report. In that occasion, probation erroneously gave the defendant a two-level reduction for acceptance responsibility, and the defense counsel objected, saying, no, my client has not admitted his responsibility, and says the correct defense level is 36, which is the relevant conduct of between 1.5 and 4.5 kilograms of methamphetamine. Later on in the record in document 96, when the government objected and said there should be a two-level enhancement for the premise's liability, the defense said, no, that two-level enhancement is not appropriate. The correct defense level is 36, and he said it in two different times in that document. And the only thing that made up that base offense level 36 was the relevant conduct. So the defendant is telling the judge the relevant conduct is correct. We disagree with the premise's liability enhancement. And I think there's something bigger at issue than just this. If the defense attorney is telling the judge the relevant conduct is correct, we can't then expect the judges and the government and probation to go through a contested hearing to determine relevant conduct when the defense counsel agrees that it is appropriate. But the government believes it is waived at this point. With respect to the argument about the proffers. Why didn't the government just turn those over? Blake Gordon's was turned over. It's just been my practice. I know maybe other AUSAs do it differently. It's been my practice that if you have a plea agreement which supersedes the proffer, you provide those to defense counsel. And we're talking about a proffer letter and a proffer statement. The proffer statement, that is what the witness actually says during the proffer. That was turned over. All that is turned over. The letter itself, though. The letter itself. Why not just turn those over? Well, I may in the future. But I know the Wiedenberger case says once the plea agreement is executed, then that supersedes it. And I don't. And I just normally don't. The defense counsel. There are other cases, though, where the government uses proffer letters to try to help bolster credibility of cooperating with this. So it's understandable why defense counsel might be curious to see those things. I understand. And this defense counsel is not a newbie, Mr. Keene. Mr. Keene knew what the proffer letters were. He even said they're all the same. He had Blake Gordon's proffer letter. He had his client's proffer letter. The proffer letters don't change. And I think what is important is that defense counsel wanted the jury to understand not what was in the proffer letters, but the process by which the proffer statement is given by the witness to the law enforcement agents. And he says that directly to the court. I want to go into the process to show that the witness, in the defense's view, is susceptible to maybe embellishing or exaggerating or changing the story. The defense counsel wanted to show that these proffers are done, in the defense counsel's word, I believe, behind closed doors without cameras rolling. It's just law enforcement and the witness and their attorney. And the witness then gives a statement trying to appease the government in order to get a plea agreement. That entire line of questioning was brought out through the very first witness who had a plea agreement and went through the proffer process. That was Lucas Holland. The defense counsel could have gone through that with all the other witnesses, but the defense counsel had made his point. This is the process. In addition, I would point out that Blake Gordon, who did not have a cooperating plea agreement because he pled open, the government acknowledged the defense counsel can use this proffer letter to cross-examine Mr. Gordon. And the defense counsel did not do that. The defense counsel did not show Mr. Gordon the proffer letter. The defense counsel did not introduce the letter into evidence, did not show the jury the proffer letter. And I think that's important because it goes to what the defense counsel's strategy was with the proffer letter, and that was to explain the process by which the witness gives the statement and not necessarily the contents of the letter themselves. Let's see. Oh, we went to the conspiracy. I think the government believes there's ample evidence of a conspiracy in this case. And I would suggest to the court, can you look at especially the defendant and Robert Weir? I'm going to take those two. It's not a traditional hub-and-spoke where we have one person in the middle and a lot on the edges. We have the defendant and Robert Weir acting in concert for a long period of time and other individuals joining this conspiracy. And why I say that is because I did not present the evidence chronologically at trial, but I know what the evidence is and all the evidence is in the record. But Weir and the defendant and Weir are working together, and at first there's Blake Gordon involved. And there's evidence in the trial where Weir, the appellant, and first of all, Then you have Weir, Hopper, Gordon, and Payton sharing, pooling their money together, going to Missouri to get the methamphetamine to bring it back. I think what was important about that instance was Weir was the one. The first instance where Weir drove the defendant, the defendant had the source of supply. On the second trip involving Blake Gordon and Sheriff Payton, it was Weir's source of supply that provided the methamphetamine. But they were short an ounce. So you have four people purportedly buying four ounces of methamphetamine and they only get three. Weir says, I will take the loss. That shows more than just a buyer-seller agreement. It shows people working together in concert. And what happens is Hopper says, no, you take half of mine to sell. So Hopper is absorbing half of Weir's loss. Then you have them, after Blake Gordon is arrested and out of the picture, you have them meeting up with Riley and Howland. And Weir, and you have to understand, Weir and Hopper live about 30 miles from where Riley and Howland are. I mean, Creel Springs, Illinois, just look on a map, and Murfreesboro, Illinois, about 30 miles away. But Weir and Hopper are pooling their money to put together with others to pool money to go to Missouri to get the drugs. And sometimes Weir will give Hopper Weir's money to go buy these drugs. Sometimes Hopper will give Weir the money. Sometimes they'll go together. It's this combination of individuals who are doing things to further the distribution of methamphetamine in southern Illinois. I'm not going to go through all the examples, but in my brief I cite out a bunch of examples where you see Weir and Hopper working together in concert and people come and go. After, for example, after Riley and Howland leave, Weir and Hopper are going to go get drugs from Kansas City, Missouri together. Well, Weir gets arrested, but Hopper still goes to the source in Kansas City and starts getting drugs from there. So even though Weir is gone, Hopper is still continuing the activity. Mr. Norwood, did the government try to prove any kind of structure or leadership role for Mr. Hopper? No, Your Honor. Am I correct in thinking that the theory here, in essence, is you've got a kind of loose buyer's cooperative? I'm afraid I'm not going to call it a buyer's cooperative because then I'm not sure where that's going to lead me. I think it's an agreement among him and Weir and others. Call it a wholesale cooperative. I mean, these folks are selling some of what they buy, right? Yes, Your Honor.  And they're trying to get volume discounts, in essence, right? Well, I think that's part of it, but I think there are other acts beyond that that are important. I mean, I think pooling money is essential to show that there is more than just a buyer-seller relationship but an agreement because I'm trusting you with money, you're trusting me with money, you're trusting that I will bring your drugs back. But there's also, for example, they're driving Hopper around to sell his drugs. That has nothing to do with the wholesale discount. You have Hopper asking Damien Williams to go get customers who are not paying me and bring them to me so I can collect payment. That goes beyond the wholesaler example that you have, Judge. The premises enhancement, I believe this is a factual issue. Judge Gilbert made a factual finding. Why is that an aggravating factor, Mr. Norland? I know the Sentencing Commission has said that it is, but why is that? Your Honor, I guess you would have to ask the Sentencing Commission. I know this came about, if I recall correctly, I'm talking off the top of my head so it's a little dangerous. If I recall correctly, they added this enhancement when they were lowering the penalties for the drug quantities in one of the recent amendments within the last ten years where they lowered the drug quantities. But they made certain enhancements based on activities, and that is danger violence. And I believe this has to do with danger and violence. If you're storing methamphetamine in your home, there are a lot of, in your residence, your primary residence. For meth, that would be true, not necessarily for other things, right? It depends on what the drug is. I don't know what was in the Commission's mind, but if you have heroin in your house and a kid gets it, the kid could overdose and die. But if you're manufacturing methamphetamine, even if you're buying it, if you're selling it from your house, there's an additional danger, as we know. People rob drug dealers. So it's just an additional danger if you are having and distributing all these activities from your primary residence. And there were no kids in this case, but if there are kids at a residence, then that obviously heightens any danger that may occur. I hope I have answered all the Court's questions. I have nothing further to add to my brief. If there's no further questions, I'll be glad to sit down. Thank you. Thank you, Mr. Norwood. Rebuttal on behalf of Mr. Hopper from Ms. Hudson. May it please the Court, Anne Hudson continuing for Mr. Hopper. I'd like to begin by addressing the government's argument that trial counsel below achieved all he wanted to achieve with respect to the proffer letters. Trial counsel requested the proffer letters during discovery, and he felt entitled to have the letters and to be able to introduce them as evidence. Once it was made clear by the Court that he was unable to do that, only then did he fall back to a secondary objective of making clear the proffer process to the jury. Was that a secondary objective, or was that his explanation to the trial judge as to why he wanted the proffer letters in the first instance? He explained that he wanted the proffer letters to describe the purpose for impeachment of each of the witnesses. And when it was clear that he wouldn't be able to receive them, then he wanted to explain the proffer process, which he was able to do one time. And he was only, I think it's notable, able to address proffer letters on recross of Lucas Holland because the government brought up the proffer letters on redirect. And so that might go to explain why he didn't bring them up with respect to the other witnesses. Was there something that precluded him from raising it on cross-examination in the first instance? I think the government made clear that they would continue to, that they would object. And so he felt only, it seemed like he only felt comfortable doing so after it was already raised on recross. Turning now to the issue of double counting and sentencing. Now, while it's true the trial counsel argued for the base offense level, he never discussed the drug quantity amount. And furthermore, when he was arguing for that base offense level, what he was doing is arguing against a higher offense level. He was arguing against the enhancement. So he really wasn't affirmatively arguing for drug quantity at all. And given this court's precedent of applying waiver liberally in favor of the defendant, that is not a knowing, an intentional relinquishment of a known right. It's clear because there's simply no strategic reason to not object to this double counting. The cases cited by the government are of issues where there were frivolous arguments that were waived. Here, this is clearly not a frivolous argument. There's clear double counting here of these drugs, which raised Mr. Hopper's sentence. And furthermore, this court needs to look no further than Longstreet, in which a defendant similarly raised a challenge to drug amount for the first time on appeal. And this court reviewed that issue for plain error. And we know, furthermore, from Rosales Morales, that a sentence under an incorrect guideline, as we have here, is a plain error that affects Mr. Hopper's substantial rights. Now, just briefly to touch on conspiracy, the government said today that Mr. Before we move on from this, put yourself in the district judge's seat for a moment. At what point could you confidently go forward with defense counsel saying and prosecutors saying, we all agree on the guideline calculations? I don't believe that the error here rests solely in the role of the district court. I think it is the role of the parties below to review and to raise objections. Precisely. Sorry? Precisely. Right. And so only when the error is so clear and is plainly visible, I believe in Miller, that only when we can feel confident that an error was made here can this court address it. And I think that's exactly what we have here. This is similar to the double counting in Rosales Morales, that everyone missed it. It was the defendant's burden to raise as well, but the fact of the matter is that Mr. Hopper should not be punished for what everyone missed. And the fact of the matter is that without the amounts of drugs that are double counted here, Mr. Hopper's base offense level would have been two points lower, which would have brought his sentence at the low end of one range, would have brought it down 47 months if he was sentenced on a similarly low range. And any sentence that is given under the incorrect guideline range is a plain error that affects substantial rights. We know that from the circuit's precedent and from the Supreme Court precedent. And finally, just briefly, the government today said that Mr. Hopper said to Mr. Weir, you take this to sell. And that's simply not true. That's not on the record. And that is evidence of what the exact evidence that is missing here, which is an agreement to further distribution. There may be agreements to buy, but there is clearly no agreement to further distribution here, which is what this court needs to uphold a conviction for conspiracy. Why isn't Williams enough to support it as the driver and the debt collector? Throughout trial, the government proceeded, outlined a vast overarching conspiracy that involved many different people. If it were to have proceeded under a conspiracy solely involving Mr. Hopper and Mr. Williams, the entire trial would have been different. Mr. Hopper would have presented a different defense, and there would have been a much lower relevant conduct determination at sentencing. Thank you very much. Ms. Hudson, the case is taken under advisement. Our thanks to all counsel and in particular to the students from the Bloom Clinic for your services to your client and to the court. We'll move on to the next.